HENRY P. MCDONALD AND BARBARA MCDONALD, HIS WIFE, PLAINTIFFS-RESPONDENTS, v. JOSEPH S. MIANECKI AND DELORES MIANECKI, HIS WIFE, DEFENDANTS-APPELLANTS.

Argued November 27, 1978—Decided March 6, 1979.

*Mr. Morris M. Schnitzer* argued the cause for appellants (*Messrs. Schnitzer* and *Schnitzer,* attorneys).

*Mr. William R. Albrecht* argued the cause for respondents (*Messrs. Schenck, Price, Smith* and *King,* attorneys).

The opinion of the court was delivered by

PASHMAN, J. In this case, we are called upon to decide whether an implied warranty of workmanship and habitability arises upon the sale of a home by a builder-vendor, and, if so, whether potability of the water supply is included within the realm of warranted items. For the reasons given herein,

we conclude that both questions must be answered in the affirmative. A further issue is raised regarding the plaintiff's duty to mitigate damages.

## I

### *Factual Background*

In 1972 Joseph Mianecki, one of the defendants herein, placed a newspaper advertisement in which he offered to build a house on a certain piece of property now identified as 7 Dolores Place, Mine Hill Township. Plaintiffs Mr. and Mrs. Henry McDonald, desirous of purchasing a new home, responded to this advertisement and in July 1972 met with Mianecki at the proposed site and discussed the type of house they wished to have constructed. At that meeting the McDonalds were informed that Mianecki had built two other houses in the area. Although Mianecki was also employed as a construction project engineer by a large commercial contractor, by the start of the present litigation he classified his occupation as that of "builder."

The parties reached agreement as to the dwelling to be erected which was formalized in a written contract dated July 17, 1972. The purchase price was $44,500. The contract provided, *inter alia,* that the house would be serviced by water from a well to be constructed by Mianecki, and that the well system would be guaranteed for a one-year period. The McDonalds had never before had a house built for them nor had they lived in a home serviced by well water.

During the early stages of the construction process, the McDonalds frequently visited the property to do some painting and perform other odd jobs. At first they cleaned their hands and brushes at a nearby barn as their water supply had not yet been connected. Later, as the house neared completion, the water began to flow and the McDonalds washed up inside the home. They soon noticed that the sinks and toilet fixtures were becoming discolored and that standing water in the fixtures had a "chocolate brown" tint. The McDonalds

apprised Mianecki of the situation and were told that inasmuch as the well was newly dug there might be some impurities still present. A commercial stain-remover, "Rust-Raze," was supplied to Mrs. McDonald, who cleaned the discolored fixtures. The stains, however, shortly returned.

Due to the continuing discoloration problem, Mianecki arranged to have the water tested. This test was, in any event, a prerequisite to the obtaining of a certificate of occupancy. The test, performed by third-party defendant Duncan Medical Laboratory, indicated an unacceptably high iron content. Mianecki attempted to rectify this situation through the installation of a water softener/conditioner, manufactured and installed by third-party defendant Deran Sales, Inc. A test performed after the installation of the unit indicated that the water was acceptable and, based upon its results, a certificate of occupancy was granted. Closing of title occurred on November 15, 1972, and two days later the McDonalds settled into their new home.

The problems with the water continued after the McDonalds moved in. Although water tests conducted before March 1973 showed that the water, after passing through the conditioner, met State standards, there was sufficient evidence from which a jury could have determined that the water was non-potable. It is clear that the raw water — i. e., water before it passed through the conditioner — never satisfied State standards of potability. There was testimony that, among other things, the staining of the fixtures continued; the water had a bad odor and taste; when left standing the water fizzled like "Alka-Seltzer," gave off a vapor and turned colors; clothes washed in the washing machine became stained, as did dishware and utensils when washed in the dishwasher; and coffee would turn deep black and sugar would not dissolve. Furthermore, according to expert testimony, after March 1973 even the treated water continuously failed to meet State standards of potability.

According to plaintiffs, Mianecki was continuously informed about the condition of the water. A number of

unsuccessful attempts were made to alleviate the problem. These included replacement of the heating coils, alteration of the back-flushing cycle on the water conditioner, and the installation of a venting system designed to eliminate gas in the water pipes. By the spring of 1973 the relationship between the parties had deteriorated and no further repairs were attempted. Alternative sources of water were suggested but, due to a variety of circumstances, no viable solution was adopted. Although each party alleged that these failures were due to the other's fault, there is sufficient evidence upon which a jury could have found that plaintiffs did not act unreasonably in their attempts to ameliorate the condition.

On March 25, 1974 the plaintiffs instituted the instant suit for damages against Mianecki. The complaint alleged breach of express and implied warranties, fraudulent and negligent misrepresentations, negligent construction of the well and water system and negligent supervision of the construction and water testing. At this time plaintiffs were still residing in the Mine Hill house. In December of 1975, however, they moved to Maryland as a result of Mr. McDonald's job transfer.

Defendant Mianecki, in turn, made claims against the following third party defendants: (1) Bryan Drilling Company, the outfit which had actually drilled the well; (2) Deran Sales, Inc., the company which had installed the conditioner and performed tests on the water; (3) Duncan Medical Laboratory, the entity which had conducted the original tests on the water; and (4) Shire National Corporation and Mine Hill Board of Education, which owned the property adjacent to the McDonald's lot suspected of being the source of contamination.

A bifurcated jury trial was ordered and the trial as to liability commenced on January 19, 1976. Prior to submission of the case to the jury, the third party complaints, except that against Deran, were dismissed by the trial judge without objection from the defendants. The jurors were

charged as to fraud and misrepresentation, breach of contract, and breach of implied warranty, and were given special interrogatories to answer. They found that defendants were liable solely for breach of an implied warranty of habitability. Findings of no cause for action were returned as to the other grounds for liability as well as Mianecki's third-party complaint against Deran.

The case then proceeded to a trial as to damages. Evidence was introduced by plaintiffs with respect to the change in the quality of their lives occasioned by the lack of potable water, and as to the staining and odor. The McDonalds testified that in the spring of 1973 they had to discontinue using the water for cooking and drinking purposes, and instead were forced to obtain water by either purchasing it bottled or filling containers at a neighbor's home. Moreover, there was testimony from a real estate agent that the value of the house, assuming a lack of water problems, would be $57,660, but that with such problems the value was only $36,847.

In order to demonstrate that plaintiffs had failed to mitigate damages, Mianecki testified that on January 14, 1976 he sent, through counsel, a letter to the McDonalds offering to buy the house for $50,000. This letter reached the McDonalds on January 17, 1976, just two days before the trial began and three days after the trial was originally scheduled to commence. The proposal contained no mortgage contingency and provided for closing 90 days from the date of the signing of a contract. This offer was refused by the plaintiffs who, on January 20, 1976, signed a contract of sale for the Mine Hill home at a price of $35,000 plus one-half of any excess liability incurred by the McDonalds in paying off the outstanding mortgage and tax assessments. Plaintiffs testified that they had reached oral agreement with the ultimate purchaser prior to receiving Mianecki's proposal and that they understood Mianecki's offer to be an attempt to settle the entire case.

██ The trial court charged the jurors that in assessing damages they were to place the McDonalds in the position they would have been in had the implied warranty not been breached. Thus, the judge instructed that the McDonalds should be compensated for all damages proximately caused by the breach and within the reasonable contemplation of the parties at the time that the contract was entered into. He further elaborated on the nature of the damages awardable, charging that the McDonalds were entitled to (1) out of pocket expenses, (2) compensation for the deterioration in their quality of living, and (3) the reduction in the fair market value of their home attributable to the defect.[1] Mitigation of damages was explained at length.

The jury returned an award in favor of plaintiffs in the amount of $32,000. Motions for judgment N.O.V., new trial and remittitur were denied by the trial court.

On appeal, defendants sought reversal of the finding of implied warranty of habitability and raised numerous other allegations of error. The Appellate Division affirmed, *McDonald v. Mianecki*, 159 *N. J. Super.* 1 (App. Div. 1978), holding that "in a case such as this where a vendor-builder constructs a new house for the purpose of sale, the sale carries with it an implied warranty that it was constructed in a reasonably workmanlike manner and is fit for habitation." *Id.* at 19. Further, the appellate court concluded that the jury was given a proper opportunity to consider the

---

[1] In this regard it should be noted that diminution in value is a standard measure of damages in breach of warranty cases. *See, e. g., Somerville Container Sales, Inc. v. General Metal Corp.*, 39 *N. J. Super.* 348, 359, mod. at rehearing, 39 *N. J. Super.* 562 (App. Div. 1956); *N. J. S. A.* 12A:2–714(2). In some cases, however, it may be appropriate to utilize cost of repairs as the standard. *See 525 Main Street Corp. v. Eagle Roofing Co., Inc.*, 34 *N. J.* 251 (1961); *Glisan v. Smolenske*, 153 *Colo.* 274, 387 *P.* 2d 260, 263 (1963). The other items of awardable damages charged were also appropriate as incidental and consequential damages. *See, e. g., Collins v. Uniroyal, Inc.*, 126 *N. J. Super.* 401, 406 (App. Div. 1973), aff'd, 64 *N. J.* 260 (1974); *N. J. S. A.* 12A:2–715.

question of mitigation and that its determination was supportable by the record. *Id.* at 24–25. We granted Mianecki's petition for certification. 77 *N. J.* 498 (1978).

## II

### *Whether an Implied Warranty of Habitability Arose Under the Facts of This Case*

A. *General Legal Background*

Prior to the mid-1950's the ancient maxim of *caveat emptor* ("let the buyer beware") long ruled the law relating to the sale of real property. Thought to have originated in late sixteenth-century English trade society, the doctrine was especially prevalent during the early 1800's when judges looked upon purchasing land as a "game of chance." Hamilton, "The Ancient Maxim Caveat Emptor," 40 *Yale L. J.* 1133, 1187 (1931).[2] The maxim, derived from the then contemporary political philosophy of *laissez faire,* held that a "buyer deserved whatever he got if he relied on his own inspection of the merchandise and did not extract an express warranty from the seller." Roberts, *supra* note 2, at 836–837.

According to one commentator, however,

*Caveat emptor* \* \* \* did not adversely affect the typical buyer of a new house during the nineteenth century. In those days, after all, the home-owner-to-be was commonly a middle-class fellow who purchased his own lot of land and then retained an architect to design a home for him. Once the plans were ready the landowner hired a contractor who built a house according to the plans. Quality control was assured because the builder was paid in stages as he completed each part of the house to the satisfaction of the architect.

---

[2]Hamilton's survey of the history of *caveat emptor* is still generally considered the classic work on the subject. *See* Roberts, "The Case of the Unwary Home Buyer: The Housing Merchant Did it," 52 *Cornell L. Q.* 835, 836 n. 1 (1967) (hereinafter Roberts) ; Comment, "Extension of Implied Warranties to Developer-Vendors of Completed New Homes," 11 *Urb. L. Ann.* 257, 257 n. 2 (1976).

If the house did happen to collapse, the homeowner had a choice of lawsuits to recoup his losses: either the plans were defective, in which case the architect had been negligent, or the building job had not been workmanlike, in which case the contractor was liable. [Roberts, *supra* note 2, at 837]

Unfortunately, this blissful state of affairs has not carried over to the modern day.

After World War II * * * the building industry underwent a revolution. It became common for the builder to sell the house and land together in a package deal. Indeed, the building industry outgrew the old notion that the builder was an artisan and took on all the color of a manufacturing enterprise, with acres of land being cleared by heavy machinery and prefabricated houses being put up almost overnight. Having learned their law by rote, however, the lawyers tended to insist that *caveat emptor* nonetheless applied to these sales. [*Id.*]

In light of this modern day change in home buying practices, it is not surprising that increased pressure developed to abandon or modify the ancient doctrine. A host of commentators began to advocate the recognition of implied warranties in the sale of new houses. *See, e. g.,* Haskell, "The Case for an Implied Warranty of Quality in Sales of Real Property," 53 *Geo. L. J.* 633 (1965) (hereinafter Haskell); Bearman, "Caveat Emptor in Sales of Realty — Recent Assaults Upon the Rule," 14 *Vand. L. Rev.* 541 (1961) (hereinafter Bearman); Dunham, "Vendor's Obligation as to Fitness of Land for a Particular Purpose," 37 *Minn. L. Rev.* 108 (1953).

■ A further catalyst to change derived from the evolving doctrine of implied warranties in the sale of personal property. Today, sale of a chattel generally carries with it an implied warranty of merchantability and often an implied warranty of fitness for a particular purpose. *See U. C. C.,* §§ 2–314, 2–315 (*N. J. S. A.* 12A:2–314, 315). The resulting distinction between real and personal property — a distinction which one commentator has labelled a merely fortuitous by-product of the separate historical development of legal

thinking in the two areas, Haskell, *supra,* 53 *Geo. L. J.* at 634 — has been increasingly viewed as anomalous. *See, e. g., Wawak v. Stewart,* 247 *Ark.* 1093, 449 *S. W.* 2d 922, 923 (Sup. Ct. 1970) (contrast between rules deemed indefensible); *Pollard v. Saxe & Yolles Dev. Co.,* 12 *Cal.* 3d 374, 115 *Cal. Rptr.* 648, 525 *P.* 2d 88 (Sup. Ct. 1974) (*en banc*); *Lane v. Trenholm Building Co.,* 267 *S. C.* 497, 229 *S. E.* 2d 728 (Sup. Ct. 1976); *Waggoner v. Midwestern Dev., Inc.,* 83 *S. D.* 57, 154 *N. W.* 2d 803, 806 (Sup. Ct. 1967); *Rothberg v. Olenik,* 128 *Vt.* 295, 262 *A.* 2d 461, 467 (Sup. Ct. 1970). The irony of this system was that the law "offer[ed] greater protection to the purchaser of a seventy-nine cent dog leash than it [did] to the purchaser of a 40,000-dollar house," Haskell, *supra,* 53 *Geo. L. J.* at 633, and that the buyer of a defective two-dollar fountain pen could "look to the law to get him his money back" but the person who spent his life's savings on a new home whose ceiling collapsed could not. Roberts, *supra* note 2, at 835–836.

As a result of these pressures, the law began to change. As of today, a growing number of jurisdictions have applied some form of implied warranty of habitability to the sale of new homes. *See, e. g., Cochran v. Keeton,* 287 *Ala.* 439, 252 *So.* 2d 313 (Sup. Ct. 1971); *Wawak v. Stewart, supra* (*Ark.*); *Pollard v. Saxe & Yolles Dev. Co., supra* (Cal.); *Carpenter v. Donohoe,* 154 *Colo.* 78, 388 *P.* 2d 399 (Sup. Ct. 1964); *Vernali v. Centrella,* 28 *Conn. Sup.* 476, 266 *A.* 2d 200 (Super. Ct. 1970); *Bethlahmy v. Bechtel,* 91 *Idaho* 55, 415 *P.* 2d 698 (Sup. Ct. 1966); *Hanavan v. Dye,* 4 *Ill. App.* 3d 576, 281 *N. E.* 2d 398 (App. Ct. 1972); *Theis v. Heuer,* 280 *N. E.* 2d 300 (Ind. Sup. Ct. 1972); *Krol v. York Terrace Bldg., Inc.,* 35 *Md. App.* 321, 370 *A.* 2d 589 (Ct. Sp. App. 1977); *Weeks v. Slavick Builders, Inc.,* 24 *Mich. App.* 621, 180 *N. W.* 2d 503 (Ct. App. 1970), aff'd o. b. 384 *Mich.* 257, 181 *N. W.* 2d 271 (Sup. Ct. 1970); *Smith v. Old Warson Development Co.,* 479 *S. W.* 2d 795 (Sup. Ct. Mo. 1972) (*en banc*); *Norton v. Burleaud,* 115 *N. H.* 435, 342

*A.* 2d 629 (Sup. Ct. 1975); *Centrella v. Holland Construction Corp.,* 82 *Misc.* 2d 537, 370 *N. Y. S.* 2d 832 (N. Y. Dist. Ct. 1975); *Griffin v. Wheeler-Leonard & Co.,* 290 *N. C.* 185, 225 *S. E.* 2d 557 (Sup. Ct. 1976); *Jones v. Gatewood,* 381 *P.* 2d 158 (Okl. Sup. Ct. 1963); *Yepsen v. Burgess,* 269 *Or.* 635, 525 *P.* 2d 1019 (Sup. Ct. 1974) (*en banc*); *Elderkin v. Gaster,* 447 *Pa.* 118, 288 *A.* 2d 771 (Sup. Ct. 1972); *Lane v. Trenholm Bldg. Co., supra* (S. C.); *Waggoner v. Midwestern Dev., Inc., supra* (S. Dak.); *Humber v. Morton,* 426 *S. W.* 2d 554 (Sup. Ct. Tex. 1968); *Bolkum v. Staab,* 133 *Vt.* 467, 346 *A.* 2d 210 (Sup. Ct. 1975); *Klos v. Gockel,* 87 *Wash.* 2d 567, 555 *P.* 2d 1349 (Sup. Ct. 1976) (*en banc*); *Tavares v. Horstman,* 542 *P.* 2d 1275 (Wyo. Sup. Ct. 1975). The modern trend is clearly in favor of implied warranties and this may, indeed, now be the majority rule. *See generally, Annotation,* "Liability of Builder-Vendor or other Vendor of New Dwelling for Loss, Injury, or Damage Occasioned by Defective Condition Thereof," 25 *A. L. R.* 3d 383 (1969). One commentator has even predicated that *caveat emptor* will be totally abolished in the near future. McNamara, "The Implied Warranty in New-House Construction Revisited," 3 *Real Est. L. J.* 136, 139 (1974).

█ Although major developments in the area of implied warranty have generally been initiated by the judiciary, other branches of government have not been inactive.[3] In this respect, we note that § 2–309 of the Uniform Land Transactions Act — not yet adopted in New Jersey — provides for implied warranties. The Commissioner's Prefatory Note to this law states that:

---

[3] In making new law, courts should always consider the impact of relevant legislative enactments. *See* Landis, "Statutes and the Sources of Law," *Harvard Legal Essays* 213 (1934), reprinted in 2 *Harv. J. Legis.* 7 (1965).

Perhaps the most important example of modernization of real estate law [effected] by this Act is Section 2–309 which imposes implied warranties of quality on persons in the business of selling real estate. For a substantial period of years, the nearly universal opinion of writers on the subject has been that the old rules of caveat emptor were totally out of date and pernicious in effect.

> [*Uniform Laws Annotated, Vol. 13,*
> *1979 Pamphlet,* at 41]

Further, the building industry itself, through the National Association of Home Builders (N. A. H. B.) has promulgated a Home Owners Warranty Program commonly known as H.O.W. *See* "The National Association of Home Builders, What About H.O.W. — Home Owners Warranty," (N. A. H. B. Library No. 60.13, 1975), at 5. Although the program has not yet been widely adopted, N. A. H. B. claims that the express warranty is "good for the builder, good for the consumer [and] good for business." *Id.*

Finally, we would be remiss if we did not note our own Legislature's commendable program of protecting homeowners. It has recently enacted The New Home Warranty and Builders' Registration Act, *N. J. S. A.* 46 :3B–1 *et seq.,* which provides for the registration of all builders of new homes, *N. J. S. A.* 46 :3B–5, and authorizes the Commissioner of the Department of Community Affairs to establish certain new home warranties, *N. J. S. A.* 46 :3B–3. Claims for breach may be satisfied out of a home warranty security fund after notice and hearing. *N. J. S. A.* 46 :3B–7. The statute specifically states that the protection it offers does not affect other rights and remedies available to the owner, although an election of remedies is required. *N. J. S. A.* 46 :3B–9. The implied warranty which we today find exists in a contract for the sale of a new home thus complements the Act and is, in our opinion, fully in accord with the legislative policy there evinced.

The reasoning underlying the abandonment of *caveat emptor* in the area of home construction is not difficult to fathom. Tribunals have come to recognize that "[t]he

purchase of a new home is not an everyday transaction for the average family[;] * * * in many instances [it] is the most important transaction of a lifetime." *Bethlahmy v. Bechtel, supra,* 415 *P.* 2d at 710. *See e. g., Hartley v. Ballou,* 20 *N. C. App.* 493, 201 *S. E.* 2d 712, 714 (Ct. App); rev'd on other gds., 286 *N. C.* 51, 209 *S. E.* 2d 776 (Sup. Ct. 1974); *Humber v. Morton, supra,* 426 *S. W.* 2d at 561; *Tavares v. Horstman, supra,* 542 *P.* 2d at 1279. Courts have also come to realize that the two parties involved in this important transaction generally do not bargain as equals. The average buyer lacks the skill and expertise necessary to make an adequate inspection. *See, e. g., Weeks v. Slavick Builders, Inc., supra,* 180 *N. W.* 2d at 505; *Tavares v. Horstman, supra,* 542 *P.* 2d at 1279; Bearman, *supra,* 14 *Vand. L. Rev.* at 574; Note, "Expansion of Consumer Protection in the Purchase of New Homes," 3 *W. St. U. L. Rev.* 106, 109 (1975). Furthermore, most defects are undetectable to even the most observant layman and the expense of expert advice is often prohibitive. *See, e. g.,* Note, "The Doctrine of *Caveat Emptor* as Applied to Both the Leasing and Sale of Real Property: The Need for Reappraisal and Reform," 2 *Rutgers-Camden L. J.* 120, 137 (1970). The purchaser therefore ordinarily relies heavily upon the greater expertise of the vendor to ensure a suitable product, *see, e. g.,* Bearman, *supra,* 14 *Vand. L. Rev.* at 545–546; Comment, "Extension of Implied Warranties to Developer-Vendors of Completed New Homes," 11 *Urb. L. Ann.* at 260 (1976), and this reliance is recognized by the building trade. *See, e. g., Pollard v. Saxe & Yolles Dev. Co., supra,* 115 *Cal. Rptr.* at 651, 525 *P.* 2d at 91.

Aside from superior knowledge, the builder-vendor is also in a better position to prevent the *occurrence* of major problems. *Elderkin v. Gaster, supra,* 288 *A.* 2d at 776–777; *House v. Thornton,* 76 *Wash.* 2d 428, 457 *P.* 2d 199, 204 (Sup. Ct. 1969). *See, e. g.,* Note, "The Doctrine of *Caveat Emptor* as Applied to Both the Leasing and Sale of Real Property: The Need for Reappraisal and Reform," 2

*Rutgers-Camden L. J.* at 137. As one court has stated, "[i]f there is a comparative standard of innocence, as well as of culpability, the defendants who built and sold the house were less innocent and more culpable than the wholly innocent and unsuspecting buyer." *House v. Thornton, supra,* 457 *P.* 2d at 204.

It is not in expertise alone that the builder-vendor is generally superior. In the vast majority of cases the vendor also enjoys superior bargaining position. *See, e.g., Weeks v. Slavick Builders, Inc., supra,* 180 *N. W.* 2d at 505; Comment, "Expansion of Consumer Protection in the Purchase of New Homes," *supra,* 3 *W. St. U. L. Rev.* at 109–110; Note, "The Doctrine of *Caveat Emptor* as Applied to Both the Leasing and Sale of Real Property: The Need for Reappraisal and Reform," *supra,* 2 *Rutgers-Camden L. J.* at 136–137. Standard form contracts are generally utilized and "[e]xpress warranties are rarely given, expensive, and impractical for most buyers to negotiate. Inevitably the buyer is forced to rely on the skills of the seller." Comment, "Extension of Implied Warranties to Developer-Vendors of Completed New Homes," *supra,* 11 *Urb. L. Ann.* at 260.

The application of an implied warranty of habitability to sellers of new homes is further supported by the expectations of the parties. Clearly every builder-vendor holds himself out, expressly or impliedly, as having the expertise necessary to construct a livable dwelling. It is equally as obvious that almost every buyer acts upon these representations and expects that the new house he is buying, whether already constructed or not yet built, will be suitable for use as a home. Otherwise, there would be no sale. As the California Supreme Court has noted:

In the setting of the marketplace, the builder or seller of new construction * * * makes implied representations, ordinarily indispensable to the sale, that the builder has used reasonable skill and judgment. * * * On the other hand, the purchaser does not usually possess the knowledge of the builder and is unable to fully examine a complete house and its components. * * * Further unlike the pur-

chaser of an older building, he has no opportunity to observe how the building has withstood the passage of time. Thus he generally relies on those in a position to know * * * and his reliance is surely evident to the construction industry.

> [*Pollard v. Saxe & Yolles Dev. Co., supra,*
> 115 *Cal. Rptr.* at 651, 525 *P.* 2d at 91]

That Court has therefore decided that "builders and sellers of new construction should be held to what is impliedly represented — that the completed structure was designed and constructed in a reasonably workmanlike manner." *Id.,* 115 *Cal. Rptr.* at 651, 525 *P.* 2d at 91.

Other considerations also press in favor of an implied warranty of habitability. As previously mentioned, implied warranties of merchantability and fitness have become standard fare in the area of personal property; and the failure to provide similar protection to a family's most important purchase has become increasingly indefensible. Moreover, the existence of warranties may well discourage sloppy building practices and encourage care in the construction of houses. *See, e. g., Humber v. Morton, supra,* 426 *S. W.* 2d at 562; 7 Williston, *Contracts,* § 926A at 818 (3d Ed. 1963). As noted by the Supreme Court of Texas:

> The caveat emptor rule as applied to new houses is an anachronism patently out of harmony with modern home buying practices. It does a disservice not only to the ordinary prudent purchaser but to the industry itself by lending encouragement to the unscrupulous, fly-by-night operator and purveyor of shoddy work.
>
> > [*Humber v. Morton, supra,*
> > 426 *S. W.* 2d at 562]

In the 1963 edition of Williston, *Contracts,* Professor Jaeger, the editor, recommended the adoption of implied warranties stating that:

> It would be much better if this enlightened approach were generally adopted with respect to the sale of new houses for it would tend to discourage much of the sloppy work and jerry-building that has become perceptible over the years.
>
> > [7 Williston, Contracts, § 926A,
> > at 818 (3d. ed. 1963)]

Thus, the application of an implied warranty has the salutary effects of placing liability on the party responsible for placing the defective article in the stream of commerce and encouraging more careful and thorough building practices.

### B. *New Jersey Case Law*: *Schipper v. Levitt*

New Jersey has not been inactive in charging builders with the responsibility of constructing habitable dwellings. On the contrary, the courts of this State have been leaders in this area, as in other aspects of consumer protection. *See, e. g., Henningsen v. Bloomfield Motors, Inc.,* 32 *N. J.* 358 (1960) ; *Santor v. A & M Karagheusian, Inc.,* 44 *N. J.* 52 (1965). In *Schipper v. Levitt & Sons, Inc.,* 44 *N. J.* 70 (1965), this Court, in an opinion which has been cited for its "momentous impact on the development of protection for the new home buyer," Comment, "Expansion of Consumer Protection in the Purchase of New Homes," *supra,* 3 *W. St. U. L. Rev.* at 111, held that builder-vendors are strictly liable in tort for injuries caused by defects existing in a newly constructed home.

The infant plaintiff in *Schipper* had been badly scalded due to the unusually high temperature of water coming from a "hot" water faucet. After holding that the builder-vendor, Levitt & Sons, Inc., "a well known mass developer of homes," 44 *N. J.* at 74, could be held liable on negligence principles, *id.* at 80–88, this Court turned its attention to the areas of warranty and strict liability.

We noted that *caveat emptor* was an established doctrine in real estate law but emphasized that:

[t]he law should be based on current concepts of what is right and just and the judiciary should be alert to the never-ending need for keeping its common law principles abreast of the times. Ancient distinctions which make no sense in today's society and tend to discredit the law should be readily rejected. * * *

[*Id.* at 90]

We then stated that "there are no meaningful distinctions between Levitt's mass production and sale of homes and the mass production and sale of automobiles and * * * the pertinent overriding policy considerations are the same." *Id.* We found therefore that the warranty or strict liability principles of prior New Jersey personalty cases should be extended to the sale of new homes.

> When a vendee buys a development house from an advertised model * * * he clearly relies on the skill of the developer and on its implied representation that the house will be erected in reasonably workmanlike manner and will be reasonably fit for habitation. He has no architect or other professional adviser of his own, his actual examination is, in the nature of things, largely superficial, and his opportunity for obtaining meaningful protective changes in the conveyancing documents prepared by the builder vendor is negligible.
>
> [*Id.* at 91]

The defendant's contention that *caveat emptor* should determine the Court's decision was disposed of as follows:

> The arguments advanced by Levitt in opposition to the application of warranty or strict liability principles appear to us to lack substantial merit. Thus its contention that *caveat emptor* should be applied and the deed viewed as embodying all the rights and responsibilities of the parties disregards the realities of the situation. *Caveat emptor* developed when the buyer and seller were in an equal bargaining position and they could readily be expected to protect themselves in the deed. Buyers of mass produced development homes are not on an equal footing with the builder vendors and are no more able to protect themselves in the deed than are automobile purchasers in a position to protect themselves in the bill of sale. Levitt expresses the fear of "uncertainty and chaos" if responsibility for defective construction is continued after the builder vendor's delivery of the deed and its loss of control of the premises, but we fail to see why this should be anticipated or why it should materialize any more than in the products liability field where there has been no such result.
>
> [*Id.* at 91-92]

Further, the Court denied that it was making developers into " 'virtual insurers' " of the property, noting that the test

of fitness was one of reasonableness and not "absolute perfection." *Id* at 92.

## C. *The Builder's Contractual Liability*

■■ Although *Schipper* was primarily concerned with the tort responsibility of a builder-vendor of new homes, the underlying basis of the Court's decision — that the outmoded concept of *caveat emptor* should be abandoned — is equally applicable in the present context.[4] For the reasons first expressed in *Schipper* and more fully explicated in Part A of today's opinion, we therefore hold that builder-vendors do impliedly warrant that a house which they construct will be of reasonable workmanship and habitability. An implicit understanding of the parties to a construction contract is that the agreed price is tendered as consideration for a home that is reasonably fit for the purpose for which it was built — *i. e.*, habitation. Illusory value is a poor substitute for quality. The consumer-purchaser should not be subjected to harassment caused by structural defects. He deserves both the focus and concern of the law. Any other result would be intolerable and unjust. *See, e. g., Tavares v. Horstman, supra,* 542 *P.* 2d at 1279.

Further, we hold that such a warranty arises whenever a consumer purchases from an individual who holds himself out as a builder-vendor of new homes — regardless of whether he can be labeled a "mass producer." Whether the builder be large or small, the purchaser relies upon his superior

---

[4]*Schipper*, as noted above, involved an action for personal injuries by a third party not in privity with the builder. Thus, it was natural that the Court would primarily be concerned with tort principles. Nevertheless, it is striking that the Court talked repeatedly of "warranty *or* strict liability," *id.* at 90, 91, 92, 96 (emphasis added), cited contract as well as tort cases, and spoke of unequal bargaining power and "the comparable warranty of merchantability in the sale of goods," *id.* at 92. This could well support an argument that the Court meant to allow recovery on either theory depending upon the facts of the particular case.

knowledge and skill, and he impliedly represents that he is qualified to erect a habitable dwelling. He is also in a better position to prevent the existence of major defects. Whether or not engaged in mass production, builders utilize standard form contracts, and hence the opportunity to bargain for protective clauses is by and large nonexistent. Finally, it is the builder who has introduced the article into the stream of commerce. Should defects materialize, he — as opposed to the consumer purchaser — is the less innocent party.

That a consumer purchases from a "small-scale" builder-vendor does not alter the fact that to him this transaction is one of, if not the, major investment of his lifetime and hence worthy of great protection. Moreover, there is no less need to discourage faulty craftsmanship merely because the builder is not a mass producer. Indeed, a holding that small builders are exempt from the implied warranty of habitability would encourage the very "unscrupulous, fly-by-night operator[s] and purveyor[s] of shoddy work" which were condemned by the court in *Humber v. Morton, supra,* 426 *S. W.* 2d at 562. We shall not place our imprimatur upon a rule which would have such an effect. Finally, it should be noted that tribunals in other jurisdictions have extended warranties to small builder-vendors. *See, e. g., Smith v. Old Warson Dev. Co.,* 479 *S. W.* 2d 795 (Sup. Ct. Mo. 1972) (*en banc*); *Hartley v. Ballou, supra; Lane v. Trenholm Building Co., supra; Bolkum v. Staab, supra. See generally,* Roberts, *supra* note 2 at 863.

We need not here decide whether an implied warranty of habitability applies to every sale of a new home. This is not a case, for example, where an individual builds a house for his own use and later decides to sell. The sale here was "commercial in nature, not casual or personal." *Bolkum v. Staab, supra,* 346 *A.* 2d at 211. Mr. Mianecki placed a general advertisement evidencing his willingness to construct a home on a particular plot of land. He had previously built two homes in the same general neighborhood and so informed plaintiffs. By the time of trial he declared his profession to

be that of "builder." Although he was also employed as a construction engineer, he was nevertheless in "business" as a builder, albeit on a part-time basis. Under these circumstances, we have no hesitation in finding that the doctrine of implied warranty applies.[5]

D. *Whether an implied warranty of habitability should extend to potability of water*

Defendants maintain that they should not be held responsible for the lack of potable water inasmuch as the defect was not due to any substandard construction on their part. Although we concede that the considerations in favor of an implied warranty do not weigh as strongly in a case such as this, nevertheless we are convinced that of the two parties the burden should fall on the less innocent defendant.

In *Elderkin v. Gaster, supra,* the Supreme Court of Pennsylvania considered a closely analogous factual situation. There, the plaintiffs had purchased a lot and home in the

---

[5]In addition to the applicability of warranty to "casual" sales of new homes, we explicitly leave open several other questions. First, as previously mentioned, this case was tried on the theory of implied warranty. We therefore leave unanswered whether strict liability should be applied to other than mass-builders. Differences in the theories might justify differing results. *See generally*, Roberts, *supra* note 2, at 863; Comment, "Expansion of Consumer Protection in the Purchase of New Homes," *supra*, 3 *W. St. U. L. Rev.* at 118–127. Strict liability has, however, been applied to small builders. *See Patitucci v. Drelich*, 153 *N. J. Super.* 177 (Law Div. 1977). We further decline to consider whether a different result should apply in third party actions. In this case we clearly have privity of contract, which was lacking in *Schipper*. We therefore leave for more appropriate cases the resolution of the contours of and requirements for suits by injured third parties. Furthermore, we do not address questions regarding the applicability of implied warranties to the sale of used houses. *But cf. Weintraub v. Krobatsch*, 64 *N. J.* 445 (1974) (rescission may be predicated upon deliberate concealment of or failure to disclose roach infestation). Finally, we are not in this case called upon to determine whether express disclaimers of implied warranty by builder-vendors are void as against public policy or require special procedural safeguards.

ironically named Spring Valley. Water was to be provided by a private system. The quality and quantity of water to be supplied were not mentioned in the contracts and deed. Upon completion of the home, however, it was discovered that the water was unpotable in that it contained excess nitrates and detergents. The Court rejected the builder's contention that no implied warranty should arise, stating that:

In several cases, * * * the implied warranty of habitability was found to have been breached not because of structural defects, but because of the unsuitable nature of the site selected for the home. This seems to be a natural application of the implied warranty of habitability of the home, since selection and sub-division of the home sites are within the exclusive domain of the builder-vendors. The developer holds himself out, not only as a construction expert, but as one qualified to know what sorts of lots are suitable for the types of homes to be constructed. Of the two parties to the transaction, the builder-vendor is manifestly in a better position than the normal vendee to guard against defects in the home site and if necessary to protect himself against potential but unknown defects in the projected home site.

While we can adopt no set standard for determining habitability, it goes without saying that a potable water supply is essential to any functional living unit; without drinkable water, the house cannot be used for the purpose intended. Accordingly, we find the implied warranty of habitability to have been breached by the appellee in the instant case.

> [288 *A.* 2d at 777
> (citations omitted)]6

The North Carolina Court of Appeals has reached a similar result. *Lyon v. Ward,* 28 *N. C. App.* 446, 221 *S. E.* 2d 727 (1976). In that case the well failed to deliver an adequate supply of usable water. The Court there held that:

---

6We note our own Legislature's emphasis on the importance of water quality. The Legislature has declared that "it is a paramount policy of the State to protect the purity of the water we drink * * *." *N. J. S. A.* 58:12A-2 (part of the Safe Water Drinking Act, *N. J. S. A.* 58:12A-1 *et seq.*). Further concern for water quality can be found in the Water Pollution Control Act, *N. J. S. A.* 58:10A-1 *et seq.*, and the Water Quality Planning Act, *N. J. S. A.* 58:11A-1 *et seq.*

Because an adequate supply of usable water is an absolute essential utility to a dwelling house, we believe that the initial purchaser of a house from the builder-vendor can reasonably expect that a well constructed on the premises by the builder-vendor will provide an adequate supply of usable water. We hold that at the time of the passing of the deed or the taking of possession the builder-vendor of a house impliedly warrants to the initial purchaser that a well constructed on the premises by him will provide water for the dwelling house which is adequate and usable.

[221 *S. E.* 2d at 729–730]

*Cf. Ruane v. Cardinal Realty, Inc.,* 116 *N. H.* 321, 358 *A.* 2d 412 (Sup. Ct. 1976) (action for breach of contract for failure to supply adequate usable water; court holds in favor of plaintiff, speaking in terms of implied warranty and citing *Elderkin*).

Other cases have found a breach of an implied warranty in analogous defects involving the suitability of the site, even though defendants had not improperly constructed or designed a building. In *House v. Thornton, supra,* the Supreme Court of Washington held the builder liable for damages resulting from instability of the soil. The court noted that there "was no proof that the defendants failed to properly design and erect the building, or that they used defective materials or in any respect did an unworkmanlike job * * *." Yet

they sold and turned over to plaintiffs a brand-new $32,000 residence which turned out to be unfit for occupancy. As between vendor and purchaser, the builder-vendors, even though exercising reasonable care to construct a sound building, had by far the better opportunity to examine the stability of the site and to determine the kind of foundation to install. Although hindsight, it is frequently said, is 20–20 and defendants used reasonable prudence in selecting the site and designing and constructing the building, their position throughout the process of selection, planning and construction was markedly superior to that of their first purchaser-occupant. To borrow an idea from equity, of the innocent parties who suffered, it was the builder-vendor who made the harm possible. If there is a comparative standard of innocence, as well as of culpability, the defend-

ants who built and sold the house were less innocent and more culpable than the wholly innocent and unsuspecting buyer.[7]

[457 *P.* 2d at 203–204]

Other courts have reached similar results. *See, e. g., F & S Construction Co. v. Berube,* 322 *F.* 2d 782 (10th Cir. 1963) (applying Colorado law); *Mulhern v. Hederich,* 163 *Colo.* 275, 430 P. 2d 469 (Sup. Ct. 1967); *Glisan v. Smolenske,* 153 *Colo.* 274, 387 *P.* 2d 260 (Sup. Ct. 1963); *Waggoner v. Midwestern Dev. Inc., supra.*

 We agree with the rationale of the above decisions. Accordingly, we hold that the implied warranty of habitability encompasses the potability of the water supply.[8]

### III

### *Mitigation of Damages*

Defendants maintain that plaintiffs failed to mitigate damages in that they rejected Mianecki's offer of $50,000 and sold the home to another purchaser for approximately

---

[7] This equitable sentiment was echoed by the Supreme Court of South Carolina which stated that "liability is not founded upon fault, but because [the seller] has profited by receiving a fair price and, as between it and an innocent purchaser, the innocent purchaser should be protected from latent defects." *Lane v. Trenholm Building Co., supra,* 229 *S. E.* 2d at 731.

[8] We also wish to briefly comment as to the time element in this case. As noted above, the quality of the water being supplied to the plaintiffs decreased sharply in the spring of 1973. There is some question as to whether defendants should be held responsible for defects manifesting themselves only months after the sale of the house. We also noted, however, that the jury could well have found that the water was never potable. Moreover, the jury was instructed that in dealing with the change in water quality, the test to apply was one of reasonableness in determining whether the damage was proximate enough to the original defect so as to make the builder liable. We hold that this is the correct standard, *see, e.g., Waggoner v. Midwestern Dev., Inc., supra,* 154 *N. W.* 2d at 809; *Tavares v. Horstman, supra,* 542 *P.* 2d at 1282; *Smith v. Old Warson Dev. Co., supra,* 479 *S. W.* 2d at 801, and that there was sufficient evidence to support the jury's conclusion.

$35,000. We find that their contention in this regard lacks merit.

It is well settled that injured parties have a duty to take reasonable steps to mitigate damages. *See, e. g., Mc-Graw v. Johnson,* 42 *N. J. Super.* 267, 273 (App. Div. 1956). In this case, however, there is ample credible evidence from which a jury could have found that plaintiffs did make all reasonable attempts. Defendant's proposal to purchase the home was made on the eve of trial and could reasonably have been construed by the McDonalds as an offer to settle the entire case. Plaintiffs testified that this was their understanding. If this were true, then plaintiffs would be justified in rejecting the proposal. Moreover, according to plaintiffs' testimony, they were not apprised of the offer to purchase until after they had reached an oral agreement to sell the house to another individual. This would supply another basis for finding that plaintiffs acted reasonably under the circumstances. The jury heard both sides of the controversy. Their decision is supportable on the record and thus will not be disturbed.

## IV

### *Conclusion*

For the reasons set forth herein, we conclude that (1) the doctrine of implied warranty of habitability applies to the construction of new homes by builder-vendors whether or not they are mass-developers, and (2) potability of the water supply is included within the items encompassed by the implied warranty. *Caveat emptor* is an outmoded concept and is hereby replaced by rules which reflect the needs, policies and practices of modern day living. It is our conclusion that in today's society it is necessary that consumers be able to purchase new homes without fear of being "stuck" with an uninhabitable "lemon." *Caveat emptor* no longer accords with modern day practice and should therefore be relegated to its rightful place in the pages of history.

For the foregoing reasons, the judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice HUGHES and Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER and HANDLER—7.

*For reversal*—None.