687 A.2d 785

JAMES L. INGRAHAM, PLAINTIFF–RESPONDENT, v. TROW-BRIDGE BUILDERS, DEFENDANT–APPELLANT, DEPARTMENT OF COMMUNITY AFFAIRS, INTERVENOR–APPELLANT..

Superior Court of New Jersey
Appellate Division

Argued November 7, 1996—Decided January 30, 1997.

74

Before Judges KEEFE, CONLEY and LOFTUS.

*Thomas P. Thackston* argued the cause for appellant (*Davis, Reberkenny & Abramowitz,* attorneys).

Respondent *James L. Ingraham* argued the cause *pro se.*

*Cheryl R. Clarke,* Deputy Attorney General, argued the cause for the Intervenor (*Peter Verniero,* Attorney General of New Jersey, attorney; *Mary C. Jacobson,* Deputy Attorney General, of counsel).

The opinion of the court was delivered by

KEEFE, J.A.D.

Defendant Trowbridge Builders (Trowbridge) appeals from a judgment entered against it and in favor of plaintiff James L. Ingraham (Ingraham) in the amount of $4,300 after a non-jury trial. On appeal, Trowbridge contends that the trial judge erred in failing to apply *N.J.A.C.* 5:25–1.3, a regulation promulgated by the Department of Community Affairs (Department) pursuant to the New Home Warranty and Builders' Registration Act (the Act), to bar Ingraham's claim. Alternatively, Trowbridge contends that the trial judge erred in failing to properly apply the doctrine of mitigation of damages to Ingraham's claim.

The primary issue at trial was whether Ingraham was entitled to damages under the Act, *N.J.S.A.* 46:3B–1 to –20.[1] In defense of that claim, Trowbridge relied upon the provisions of *N.J.A.C.* 5:25–1.3. If applied to this case, that regulatory provision would have precluded Ingraham's recovery. The trial judge, however, determined that *N.J.A.C.* 5:25–1.3 was merely "an interpretive rule without the force and effect of law." In view of that determination, we granted the Department's motion to intervene.

---

[1] The parties' tacit understanding is that there is nothing in the contract that would afford Ingraham the relief he sought in his complaint. The provisions of the Act may afford remedies to a home owner notwithstanding the provisions of the contract.

Although we do not endorse the trial judge's reason for not applying the subject regulation to the facts of this case, we agree with the result, and, thus, affirm the judgment under review for the reasons stated herein.

## I

The trial judge made findings of fact relevant to liability that are not challenged on appeal. We take the following facts from his letter opinion and add certain uncontested facts from the record before us. Trowbridge constructed the house in question in 1986. In April 1987, Trowbridge decided to use the house as a model home. Accordingly, it obtained a temporary certificate of occupancy and secured new home warranty coverage (the HOW policy) under the Act.

Ingraham entered into a contract with Trowbridge to purchase the home and closed title to the property on February 24, 1989. Paragraph 23C of the contract stated: "The seller shall deliver at settlement a registration certificate for a HOW policy. Said policy is already in effect, and has a commencement date of April 22, 1987." Ingraham testified that he was not familiar with the details of the Act or regulations and, based upon representations made to him contemporaneous with the signing of the contract, was under the impression that he was buying a new home and had until April 1, 1989 to assert warranty claims against Trowbridge. Within a month of the closing, Ingraham complained to Trowbridge that rain water was seeping in through the front door. Indeed, in a letter dated March 21, 1989[2], Ingraham asked Trowbridge for a six month extension of what he understood to be the warranty cutoff date.

Trowbridge made some attempts to satisfy Ingraham's complaint concerning the leak without success. Ultimately, in February 1990, Trowbridge agreed to replace and prime the door, but

---

[2] The letter was actually dated March 21, 1988: an obvious typographical error.

not paint it, at the cost of $325. The offer was not satisfactory to Ingraham because he felt Trowbridge had the obligation to repair without cost to him.

When further discussions with Trowbridge were not productive, Ingraham filed a claim with the Home Owners Warranty Corporation (HOW). An inspector was dispatched by HOW to investigate the claim. Although the inspection report disclosed a defect in workmanship and materials which would have been covered if made during the first year of the warranty, HOW rejected the claim. The rejection was premised on HOW's determination that coverage under the policy began on April 22, 1987, and, thus, Ingraham's claim for the defects discovered during the inspection was simply untimely.

Inasmuch as Ingraham had not pursued a "remedy legally available to the owner" by filing a claim with HOW, the trial judge found that Ingraham preserved his right to pursue "any remedy legally available to [him]" by filing this complaint in Superior Court. *N.J.S.A.* 46:3B–9. The trial judge also found that Ingraham proved through expert testimony that the defect in the door frame that permitted water to enter the premises was covered under the first year statutory warranty. *N.J.S.A.* 46:3B–3b(1). The question presented was when the first year warranty period began. Did it begin on April 22, 1987, as Trowbridge contended, or did it begin on February 24, 1989 when Ingraham first occupied the house as a home? The Act provides that "[a] builder of a new home shall be liable to any owner thereof during the time period when the new home warranty, . . ., is applicable to the home for any defect therein which is covered by the warranty in accordance with its terms and conditions." *N.J.S.A.* 46:3B–4. The "Owner" is defined as "any person for whom the new home is built or to whom the home is sold for occupation by him or his family as a home. . . ." *N.J.S.A.* 46:3B–2e. The definition of "owner" does not include a "builder." *N.J.S.A.* 46:3B–2e and f.

As pertains to this case, the relevant statutory warranty given by the builder to the owner was as follows: "[o]ne year from and

after the warranty date the dwelling shall be free from defects caused by faulty workmanship and defective materials due to noncompliance with the building standards as approved by the commissioner...." *N.J.S.A.* 46:3B–3b(1). (A two year warranty is given on "defects caused by faulty installation of plumbing, electrical, heating and cooling delivery systems," and a ten year warranty for major construction defects. *N.J.S.A.* 46:3B–3b(2) and (3).) As to each warranty, the new home warranty begins on the "warranty date." *Id.* The "warranty date" is defined as "the first occupation or settlement date, whichever is sooner." *N.J.S.A.* 46:3B–2h.

The Commissioner of the Department is given the authority to "promulgate such rules and regulations as may be necessary to carry out the provisions of [the] act." *N.J.S.A.* 46:3B–10. Pursuant to that authority, a regulation was initially adopted that essentially tracked the wording of the statute as to when the warranty date began, i.e., "the first occupation or settlement date, whichever is sooner." 10 *N.J.R.* 377(b), 11 *N.J.R.* 223(c). That definition was later amended to add the words "or the date on which a certificate of occupancy issued pursuant to *N.J.S.A.* 52:27D–119 et seq. is given over to the owner" after the phrase "settlement date." 17 *N.J.R.* 2816(a), 18 *N.J.R.* 959(a). That amendment was subsequently rescinded and the original definition was amended to include "in the case of model homes, the warranty date will be the date on which a temporary certificate of occupancy is issued...." 18 *N.J.R.* 959(a); presently *N.J.A.C.* 5:25–1.3.

Trowbridge obtained a temporary certificate of occupancy as to this particular house on April 22, 1987. Thus, it contended, in accord with the regulation, that the one year warranty on the subject "new home" began on that date and had expired by the time Ingraham made the claim. The trial judge found that *N.J.A.C.* 5:25–1.3 was an "interpretive rule" without force and effect of law, and, thus, not binding on him because it was "simply the agency's opinion of the meaning of a statute." He concluded that "a model home is not occupied within the meaning of [the Act]

until someone occupies it as a home." Inasmuch as the model was not occupied as a home until the settlement date of February 24, 1989, the trial judge reasoned that date was the warranty date for the purpose of computing the first year warranty.

■ In coming to the conclusion that *N.J.A.C.* 5:25–1.3 was an interpretive rule, the judge relied upon federal cases interpreting the federal Administrative Procedure Act (APA), 5 *U.S.C.* sec.553 (b). However, there is no analogy between the APA and the State Administrative Procedure Act (SAPA), *N.J.S.A.* 52:14b–1 et seq. Unlike the APA, SAPA does not distinguish between substantive and interpretative rules. Under SAPA, an administrative rule is defined as an agency statement of general applicability and continuing effect that implements or interprets law or policy, or describes the organization, procedure or practice requirements of any agency. *N.J.S.A.* 52:14B–2(e). The term does not include an agency decision in contested cases. *Id.* Indeed, where an agency's interpretation of a statute is intended to apply across the board to all similarly situated parties, the agency must proceed by regulation and not by interpretative, quasi judicial decisionmaking. *Metromedia, Inc. v. Director, Div. of Taxation,* 97 *N.J.* 313, 478 *A.*2d 742 (1984). Thus, *N.J.A.C.* 5:25–1.3 is not merely an interpretive rule. It is a regulation promulgated pursuant to statutory authority and has the force and effect of law. *D.I.A.L., Inc. v. New Jersey Dept. of Community Affairs,* 254 *N.J.Super.* 426, 603 *A.*2d 967 (App.Div.1992).

■ Regulations that are properly promulgated carry a presumption of reasonableness. However, courts have invalidated regulations that "undermine the intent of the legislature." *GE Solid State v. Director, Div. of Taxation,* 132 *N.J.* 298, 306–07, 625 *A.*2d 468 (1993). "[T]he courts remain the 'final authorities' on issues of statutory construction and are not obliged to 'rubber stamp' their approval of the administrative interpretation" given the statute by the agency charged with its administration. *New Jersey Guild of Hearing Aid Dispensers v. Long,* 75 *N.J.* 544, 575, 384 *A.*2d 795 (1978).

■ The Act was passed to protect new homeowners and abandon the ancient doctrine of caveat emptor. *McDonald v. Mianecki*, 79 *N.J.* 275, 283–87, 398 *A.*2d 1283 (1979). The Legislature recognized that "[t]he purchase of a new home is not an everyday transaction for the average family; ... in many instances [it] is the most important transaction of a lifetime." *Id.* at 287–88, 398 *A.*2d 1283 (citations omitted). The Legislature intended to give buyers, such as Ingraham, the benefit of the warranties defined in section 3B of the Act from the time of "first occupation" by "him or his family as a home," or the "settlement date whichever is sooner." *N.J.S.A.* 46:3B–2(e) and (h). Thus, the Act's provisions must be interpreted with those principles in mind.

■ Trowbridge contends, and the Department agrees, that in accord with the plain wording of the regulation the one year warranty on Ingraham's "new home" began on April 22, 1987 and expired on April 22, 1988, eight months before it was sold to Ingraham "for occupation by him ... as a home" and ten months before the "first occupation" of the house as a home. *N.J.S.A.* 46:3B–2(e) and (h). The end result, of course, is that, as respects model homes, the first year statutory warranty is rendered nugatory when the model home is sold, as in this case, more than one year after the temporary certificate of occupancy is issued, and, when the home is sold within the year after the temporary certificate is issued, the owner receives less than the one year warranty. If Trowbridge's argument is accepted this result would abide, notwithstanding the clear statutory mandate that the warranties are given by the builder to the owner, that the builder cannot be an owner by definition, and that the owner is to have the benefit of the warranties for a fixed period commencing on the relevant warranty date. *N.J.S.A.* 46:3B–4 and 46:3B–3(e),(f),(h). ·Under Trowbridge's and the Department's construction of the statute, Trowbridge gave itself the one year warranty which the Legislature clearly envisioned was to be given by the builder to the owner. *N.J.S.A.* 46:3B–4.

We cannot imagine that the Legislature intended such an absurd result, yet the Department contends in its brief that the subject regulation dutifully expresses statutory intent. It argues:

> The coverage for defective systems, workmanship and material for a one-year period is predicated on wear and tear from occupancy and the natural degradation of materials over time. As to a model home, the Legislature would not expect a builder to be responsible for first year defects years after the home was opened for display. Thus understood, the regulatory definition of warranty date is consistent with the enabling statute and the express and implied legislative policies.

There is no such legislative intent, express or implied, in the statute, at least with respect to the builder's use of a "new home" as a model.

While the warranty covering claims for defective material and workmanship may very well have been limited to one year by the Legislature to take into account "wear and tear from occupancy," there is no reason to believe that the occupancy anticipated by the Legislature was occupancy by the builder. The only context in which occupancy is addressed in the statute is occupancy by the owner, not the builder. *N.J.S.A.* 46:3B–1. In any event, the record discloses without doubt that the defect proven in this case had nothing to do with wear and tear caused by occupancy. Rather, it was a defect caused by poor workmanship and materials at the time of construction.

Interestingly, the Department conceded at oral argument that had this house been constructed by Trowbridge on speculation, never been used as a model home, and sold to Ingraham three years after construction, Ingraham would have been entitled to the one year warranty, despite "wear and tear" resulting from prospective buyers traipsing through the house over that same period, and despite the "degradation of materials over time." Under that hypothetical scenario, the Department acknowledges that the builder is the one who bears the risk and burden of wear and tear and the degradation of materials, not the new home owner. That being so, we can find nothing in the statute requiring a different result simply because the builder decides for its own purposes to designate the house as a "model." A builder's

decision to use a house built on speculation as a model home is a business decision made primarily for its benefit to facilitate the marketing of the house. There is nothing in the statute, either express or implied, that evidences an intent to protect the builder rather than the new home owner under such circumstances. Indeed, the regulation frustrates the legislative goal. Therefore, we declare the regulation invalid.

## II

■ Trowbridge Builders, contends that Ingraham had a duty to mitigate damages. Mitigation of damages is a concept which takes into account the injured party's acts or failure to act when computing the amount of his recovery. *White v. North Bergen Township,* 77 *N.J.* 538, 546, 391 *A.*2d 911 (1978). The Court in *Ostrowski v. Azzara,* 111 *N.J.* 429, 441, 545 *A.*2d 148 (1988), explained the concept of the duty to mitigate, or the doctrine of avoidable consequences, by comparing it to the doctrine of contributory negligence. The Court stated that the doctrine of avoidable damages is

"[w]here the defendant has already committed an actionable wrong, whether tort or breach of contract, then this doctrine [avoidable consequences] limits the plaintiff's recovery by disallowing only those items of damages which could reasonably have been averted * * *[.]" "Contributory negligence is to be asserted as a complete defense, whereas the doctrine of avoidable consequences is not considered a defense at all, but merely a rule of damages by which certain particular items of loss may be excluded from consideration * * *." *McCormick on Damages,* West Publishing Company, 1935, Chapter 5, *Avoidable Consequences,* pages 127, *et seq.; see also* 61 *Harvard Law Review* (1947), 113, 131–134, Developments in Damages.

[*Ibid.*].

Further, the Court held that "expressing mitigation of damages as a percentage of fault reducing plaintiff's damages has been found to be a proper method for fairly accounting for failure to mitigate." *Id.* at 445, 545 *A.*2d 148.

■ Thus, "[i]t is well settled that injured parties have a duty to take reasonable steps to mitigate damages." *McDonald, supra,* 79 *N.J.* at 299, 398 *A.*2d 1283. Damages will not be recovered to

the extent that the injured party could have avoided his losses through reasonable efforts "without undue risk, burden or humiliation." *Restatement (Second) of Contracts*, Section 350(1),(2) (1981).

The *Restatement* provides some guidance on when the duty to mitigate begins:

> Once a party has reason to know that performance by the other party will not be forthcoming, he is ordinarily expected ... to take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise ... The amount of loss that he could reasonably have avoided by ... making substitute arrangements ... is simply subtracted from the amount that would otherwise have been recoverable as damages.

> [*Restatement (Second) of Contracts*, Section 350, comment b (1981)].

The *Restatement* further provides how much time the injured party has to make substitute arrangements:

> The injured party is expected to arrange a substitute transaction within a reasonable time after he learns of the breach ... The injured party may, however, make appropriate efforts to urge the repudiating party to perform in spite of his repudiation, and these efforts will be taken into account in determining what is a reasonable time.

> [*Restatement (Second) of Contracts*, Section 350, comment f (1981)].

However, "the burden of proving facts in mitigation of damages rest[s] upon the party breaching the contract." *Cohen v. Radio–Electronics Officers*, 275 *N.J.Super.* 241, 262, 645 *A.*2d 1248 (App.Div.1994); *see also Sommer v. Kridel*, 74 *N.J.* 446, 457, 378 *A.*2d 767 (1977) (wherein the Court stated, "generally in contract actions the breaching party has the burden of proving that damages are capable of mitigation"). Furthermore, it has been held,

> that (w)here both the plaintiff and the defendant have had equal opportunity to reduce the damages by the same act and it is equally reasonable to expect a defendant to minimize damages, the defendant is in no position to contend that the plaintiff failed to mitigate. Nor will the award be reduced on account of damages the defendant could have avoided as easily as the plaintiff ... The duty to mitigate damages is not applicable where the party whose duty it is primarily to perform the contract has equal opportunity for performance and equal knowledge of the consequences of the performance.

> [*Toyota Industrial Trucks U.S.A, Inc. v. Citizens Nat'l Bank of Evans City, et al.*, 611 *F.*2d 465, 471 (3d Cir.1979); *see also Fiat Motors of North America, Inc. v. Mellon Bank, N.A.*, 827 *F.*2d 924, 930 (3d Cir.(1987)); *Edward M. Crough, Inc.*

*v. Dep't of Gen. Services of the District of Columbia,* 572 A.2d 457, 467 (D.C.1990) ].

 Whether or not a plaintiff's efforts to mitigate his or her damages are reasonable "is a question for the trier of fact." *Higgins v. Lawrence,* 107 *Mich.App.* 178, 309 *N.W.2d* 194, 196 (1981). Thus, the proper standard in a non-jury case regarding the judge's decision on mitigation of damages "is whether the judge's findings are supported by sufficient, credible evidence in the record." *Fanarjian v. Moskowitz,* 237 *N.J.Super.* 395, 406, 568 A.2d 94 (App.Div.1989).

 The trial judge's finding that Ingraham made reasonable efforts to mitigate his damages through 1992 is supported by "sufficient, credible evidence in the record." *Ibid.* Ingraham made several efforts through September 1992 to have Trowbridge fix the defect in his door.

Ingraham first tried to have Trowbridge correct the problem in March 1989. Ingraham again contacted Trowbridge to resolve the problem, when it was discovered that Trowbridge failed to properly fix it the first time. Trowbridge was again unsuccessful in fixing the leak. Trowbridge made a third, unsuccessful attempt at fixing the leak, and Ingraham notified Trowbridge for a fourth time. Trowbridge responded in a letter dated April 21, 1989 that it was not responsible for damp basements.

Ingraham then tried to fix the leak himself by applying Thoroseal, but to no avail. Ingraham contacted defendants for a fifth time. Trowbridge then told Ingraham that the entire door assembly would have. to be replaced. It subsequently changed its position by stating that only the deteriorated portion had to be replaced. Ingraham contacted Trowbridge again, who then offered in a letter dated February 2, 1990, to fix only the door frame (not the entire door) at a cost of $325. This offer was rejected. Ingraham contacted Trowbridge again in October 1991, who made a second offer to repair only the door frame, but this time for a cost of $475. Ingraham rejected this offer also because of his belief that Trowbridge was responsible for the damage.

This chain of events presents "sufficient, credible evidence" for the trial court's finding that Ingraham was reasonable in his rejection of Trowbridge's offers to repair the leak in light of their three failed attempts to repair the door, and in light of their changed position as to how the door should be repaired. *Ibid.* Ingraham made his final attempt at having Trowbridge correct the problem in January 1992, when he filed a claim with HOW, who denied his claim in September 1992.

Not until September 1992 did Ingraham have "reason to know that performance by [Trowbridge would] not be forthcoming." *Restatement (Second) of Contracts,* Section 350, comment b (1981). At this point, plaintiff was "expected . . . to take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements." *Id.*

Furthermore, the plaintiff is "expected to arrange for substitute [arrangements] within a reasonable time after he learns of the breach." *Restatement (Second) of Contracts,* Section 350, comment f (1981). In this case, the breach occurred sometime in March 1989. However, the plaintiff may "make appropriate efforts to urge the repudiating party to perform in spite of his repudiation, and these efforts will be taken into account in determining what is a reasonable time." *Id.* Therefore, it was proper for the trial court, in this case, to take into account the Ingraham's reasonable efforts, from March 1989 through September 1992, to have Trowbridge correct the defect in his door.

In addition, Trowbridge, the party who breached the contract, had the burden of proving that Ingraham failed to make reasonable efforts through September 1992 to mitigate his damages. There is sufficient, credible evidence to support the judge's findings that Trowbridge failed to carry this burden. Furthermore, Trowbridge had ample opportunity to mitigate the Ingraham's damages, through September 1992, by the same acts. The defendant also had "equal knowledge of the consequences of the performance," or in this case, the failure to perform. *Toyota, supra,* 611 *F.*2d at 471. Thus, "the defendant is in no position to contend that

the plaintiff failed to mitigate. Nor [should] the award be reduced on account of damages the defendant could have avoided as easily as the plaintiff." *Toyota, supra,* 611 *F.*2d at 471.

For the foregoing reasons, the damage award is affirmed.