149 N.J. Super. 20 (1977)
372 A.2d 1355
CLARENCE BURD AND MARY BURD, HIS WIFE, PLAINTIFFS-RESPONDENTS,
v.
NEW JERSEY TELEPHONE COMPANY, A NEW JERSEY CORPORATION AND CONTINENTAL OIL COMPANY, A CORPORATION DOING BUSINESS IN THE STATE OF NEW JERSEY, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued January 4, 1977.
Decided March 17, 1977.
*22 Before Judges LORA, CRANE and MICHELS.
Mr. William P. Ries argued the cause for appellant New Jersey Telephone Company (Messrs. Purcell, Ries and Shannon, attorneys).
Mr. Arthur G. D'Alessandro argued the cause for appellant Continental Oil Company.
Mr. John E. Patton argued the cause for respondents (Messrs. Gaccione and Pomaco, attorneys).
The opinion of the court was delivered by LORA, P.J.A.D.
On May 16, 1974 plaintiffs Clarence Burd and Mary Burd filed suit against defendants New Jersey Telephone Company and Continental Oil Company.
At the close of plaintiffs' case defendants' motions to dismiss based upon the statute of limitations and the insufficiency *23 of the evidence were denied. At the close of all proofs the trial judge denied motions to dismiss made on the grounds that plaintiff Clarence Burd was contributorily negligent as a matter of law, that the evidence was insufficient to send the case to the jury and that the count in strict liability in tort should be dismissed for failure to prove that the product which caused Burd's injuries was defective. The trial judge also denied a motion to dismiss in behalf of defendant New Jersey Telephone Company on the ground that it was not in control of the job and should not be held vicariously liable for Burd's injuries. A motion to dismiss the count based on absolute liability because plaintiff had failed to show that the product which caused his injuries was ultrahazardous was granted. Plaintiff Mary Burd's claim was dismissed for failure to prove any damages. No appeal was taken from the dismissal of her claim.
The case was submitted to the jury, which returned a 10-2 verdict in favor of plaintiff Clarence Burd and against both defendants in the amount of $100,000. Judgment, including interest, was entered on June 26, 1975 in the amount of $107,026.44. Motions for a new trial were denied.
On appeal defendants contend that the trial judge erred (1) in finding plaintiff's claim was not barred by the statute of limitations; (2) in denying defendants' motion to dismiss based upon the alleged insufficiency of the evidence; (3) in ruling that plaintiff was not contributorily negligent as a matter of law; (4) in charging the jury on the issue of defendant New Jersey Telephone Company's vicarious liability; (5) in submitting to the jury the contract between M.B. Phillips, Inc. and New Jersey Telephone Company, and (6) in refusing to grant a new trial on the ground that the jury verdict was against the weight of the evidence.
The record reveals that on September 7, 1971 plaintiff Clarence Burd suffered a heart attack while working as a laborer for M.B. Collins, Inc., a general contractor for New Jersey Telephone Company.
*24 The contract provided, among other things, that M.B. Collins, Inc. would control the manner and mode of performance of the work. Employees of New Jersey Telephone visited the site a couple of times a week but gave no orders to the workers. However, New Jersey Telephone supplied M.B. Collins, Inc. with pipe, manhole frames, couplings and, most importantly, the glue that was manufactured by Carlon, a subsidiary of defendant Continental Oil at the time of plaintiff's heart attack.
Plaintiff had been on this job for approximately one week at the time of his heart attack. He worked in a trench which was 5' deep and 18" wide. His job was to glue together the ends of pieces of plastic pipe, using the pipe and glue supplied by New Jersey Telephone Company. He may also have done some shovelling and levelling.
The pipes were made of light plastic material and were 4" in diameter. Each section was 20' long and about 220' of pipe would be laid in an average day. The pipes were laid two across and eight high. Thus, plaintiff would glue approximately 176 pipe connections daily. No ventilating equipment was provided for use in the trench.
The temperature was in the 80s on the day of plaintiff's heart attack and he was working in a direct sunlight, causing him to sweat profusely. Burd returned from his lunch break at about 12:30 P.M. but stopped working at 12:45 due to dizziness and pains in his upper torso. At 3:45 P.M. he was admitted to the hospital. The ultimate diagnosis was acute myocardial infarction with congestive heart failure. He was released from the hospital at the end of September but suffered another heart attack on October 12, 1971 and returned to the hospital. Plaintiff has not worked since his release from the hospital at the end of October 1971 and he continues to have considerable pain when he walks.
Burd claims he was unaware of a possible link between the glue and his heart attack until October 1972 when his *25 former attorney received a report containing that suggestion from a doctor who had examined plaintiff in conjunction with the worker's compensation case.
At trial plaintiff identified a can of glue identical to that used on the job. Seventy-five percent of the glue was Tetrahydrofuran (THF). The label stated, "Caution * * * Avoid inhaling fumes * * *," but did not mention danger, toxicity or the need for adequate ventilation. Parenthetically, we note that Marvin B. Crawford, a chemical engineer employed by Continental Oil Company and Director of Technical Services for Carlon, testified that he believed this label conformed with the requirements of the Federal Hazardous Substances Act.
Burd stated that he read the label and that if it had said "danger," "toxic" or "adequate ventilation required," he wouldn't have worked in the trench with the glue. Plaintiff noted that neither M.B. Collins, Inc. nor New Jersey Telephone told him the glue was toxic. He had worked two prior jobs using the same solvent cement and had been using it for two days on this job prior to his heart attack. He would begin to feel dizzy about 1 1/2 hours after commencing work with the glue. The dizziness would subside about one hour after he finished work.
New Jersey Telephone's answers to interrogatories, which were read to the jury, revealed that it had received written warnings from Continental Oil with respect to the toxicity of the glue and the advisability of adhering to the manufacturer's precautionary instruction when using the glue. Nevertheless, no warnings, other than those on the labels, were passed along to M.B. Collins, Inc. by New Jersey Telephone.
Continental Oil's answers to interrogatories disclosed standard D 2564 of the American Society of Testing Materials which sets forth in part that adequate ventilation should be provided when THF is present in the air. Later testimony revealed, however, that this standard went into effect after *26 the accident in question and that the prior standard didn't mention ventilation.
Secondly, Continental Oil's answers disclosed that THF has a threshold limit value (tlv) of 200 parts per million parts air when measured by volume. Thus, a worker could be exposed to a time-weighted average exposure of 200 parts THF per million parts air for an eight-hour day without suffering any ill effects. Furthermore, the answer stated that adequate ventilation is suggested when the glue is in use.
Lastly, Continental Oil appended to its answers a document published by Dupont entitled "Physiological Properties of Tetrahydrofuran" and which document indicated, among other things, that exposure to THF in amounts in excess of the 200 part per million tlv caused a drop in blood pressure and hemoglobin count in test dogs. The report further advised that proper ventilation should be required when THF is present. The testimony of Crawford revealed that he relied on this report in developing the label for the glue, and his company performed no tests to determine the potential toxicity of the glue or THF.
The core of plaintiff's case involved the testimony of two experts. Abraham Wallach, a chemical engineer and toxicologist, testified that THF affects the blood, can have an adverse effect on the cardiovascular system, and that there is greater danger when the temperature is hot since the THF evaporates more quickly in higher temperatures. Furthermore, he opined that plaintiff had been exposed to an excessive concentration of THF on the day in question, far in excess of the threshold limit of 200 parts per million tlv. He believed that plaintiff was exposed to a concentration of up to 150,000 parts THF per million parts air. This belief was partly premised upon the fact that THF is heavier than air and would tend to settle in the trench, and that wind would not be a significant factor in a 5' deep trench.
*27 Marvin Crawford, testifying for the defense, declared that it would have been impossible to have such a concentration of THF in the trench. He was of the view that plaintiff had been exposed in the trench to approximately 100 parts THF to one million parts air.
Wallach was asked (in hypothetical form) whether plaintiff's exposure to excessive amounts of THF had a harmful effect on his cardiovascular system. While the question was not answered "yes" or "no" in so many words as a result of an objection, an affirmative answer was conveyed to the jury as a consequence of the colloquy between counsel and the trial judge which followed the objection, as well as Wallach's answers to questions posed by the trial judge at that time. On cross-examination, Wallach admitted he was not qualified to render any opinion as to whether plaintiff's heart attack was related to the inhalation of the THF vapors.
Dr. Harry A. Kaplan, plaintiff's medical expert and a cardiologist, examined plaintiff in August 1972 in connection with plaintiff's worker's compensation case. In response to a hypothetical question Dr. Kaplan concluded that plaintiff's exposure to an excessive concentration of THF was a substantial contributing factor to his heart attack. He conceded that his opinion was premised upon the assumptions that the concentration of THF was excessive and that plaintiff's blood pressure and hemoglobin count had fallen as a result of his exposure to it. If these physiological effects did not occur, Kaplan admitted that the glue would be unrelated to and not a substantial factor in the heart attack. However, he stated that plaintiff's blood pressure, if lowered due to inhalation of the glue, would spring back to normal in an hour or so. He admitted that plaintiff, prior to his heart attack, was suffering from arteriosclerosis, pulmonary fibrosis and chronic lung diseases, and that he may very well have had the heart attack irrespective of plaintiff's exposure to an excessive concentration of THF.
*28 Dr. Sanford Lewis, a cardiologist and defendant Continental Oil Company's medical expert, examined plaintiff in September 1972 in connection with the worker's compensation case. He testified that according to hospital records, plaintiff's hemoglobin count upon his first admission was normal, that his blood pressure was not depressed but elevated, and that there was no evidence to justify a conclusion that the THF contributed to plaintiff's heart attack. He noted the three-hour gap between the heart attack and plaintiff's admission to the hospital and he opined that this gap would tend to lower plaintiff's blood pressure. This, of course, was offered to contradict plaintiff's contention that the inhalation of THF had lowered his blood pressure, triggering the heart attack.
Nevertheless, Dr. Lewis conceded that he did not know of or consider the toxicological effects of the use of the glue when he examined plaintiff. He further admitted that the first time he concluded that the glue was not a substantial factor contributing to plaintiff's heart attack was at the trial when he was asked that question for the first time.
Defendants first contend the trial judge erred in finding plaintiff's claim was not barred by the statute of limitations.
Plaintiff's heart attack occurred on September 7, 1971 and suit was not filed until May 16, 1974. Since the applicable statute of limitations operates as a bar to suits filed more than two years after accrual of the cause of action, the key issue is whether plaintiff's cause of action accrued on September 7, 1971 or sometime thereafter. N.J.S.A. 2A:14-2.
It was stipulated that plaintiff first consulted an attorney shortly before the worker's compensation case was filed in May 1972. He was examined by Dr. Kaplan on August 21, 1972 for worker's compensation purposes. Plaintiff testified that he first learned of a possible link between the glue and his heart attack during a conversation which took *29 place in October 1972 with his attorney in the compensation case. He further testified that he was not aware that the lightheadedness he had experienced on the job was caused by the glue.
The attorney who handled plaintiff's compensation case testified that he first learned of the possible link when Dr. Kaplan submitted his report to him dated October 7, 1972 following his examination of plaintiff in August 1972. He advised plaintiff of Dr. Kaplan's findings and the possibility of instituting suit against the manufacturer of the solvent cement sometime in December 1972, which was also the time of the hearing and judgment of the worker's compensation case. Plaintiff testified that after learning of a possible third-party action, he decided "to forget about the whole works."
It was not until May of 1974 that plaintiff decided to institute the present action. The compensation attorney testified that he sent the matter to plaintiff's present counsel in December 1973 because the latter had experience with product liability cases. Plaintiff's attorneys were of the view the cause of action accrued in October 1972 when plaintiff was first made aware of a possible connection between the glue and his heart attack. Consequently, they believed the May 16, 1974 filing was timely. The trial judge held a hearing on the applicability of the discovery rule outside the presence of the jury in accordance with the direction in Lopez v. Swyer, 62 N.J. 267, 275-276 (1973). He concluded that plaintiff was entitled to invoke the rule and denied defendants' motions to dismiss based upon the statute of limitations.
The statute of limitations applicable to plaintiff's claim for personal injuries is N.J.S.A. 2A:14-2, which provides:
Every action at law for an injury to the person caused by the wrongful act, neglect or default of any person within this state shall be commenced within 2 years next after the cause of any such action shall have accrued.
*30 This statute, as any statute of limitations, is designed to stimulate litigants to pursue their causes of action diligently and to spare the courts from litigation of stale claims. They penalize dilatoriness and serve as measures of repose. Farrell v. Votator Div. of Chemetron Corp., 62 N.J. 111, 115 (1973). The Legislature, however, has never sought to define or specify when a cause of action shall be deemed to have accrued within the meaning of the statute and consequently this has been left entirely to judicial interpretation and administration. Rosenau v. New Brunswick, 51 N.J. 130, 137 (1968); Fernandi v. Strully, 35 N.J. 434, 449 (1961).
Our courts have identified the accrual of a cause of action for purposes of the statute of limitations as the date on which "the right to institute and maintain a suit" first arises. Rosenau v. New Brunswick, supra; Fredericks v. Dover, 125 N.J.L. 288, 291 (E. & A. 1940). Generally, our courts have held that a cause of action grounded on negligent injury or damage to person or property accrued, not when the negligence itself took place, but when the consequential injury or damage occurred. See Rosenau v. New Brunswick, supra; Ochs v. Public Service Ry. Co., 81 N.J.L. 661, 662 (E. & A. 1911). It has been held that when the claimant knows, or in the exercise of reasonable diligence should have known, of a breach of duty owed him by defendant, and he knows, or in the exercise of reasonable diligence should have known, that he has suffered injury as a result of that breach, his right to institute and maintain the suit arises and thus the statute of limitations commences to run. Cf. Gleason v. United States, 458 F.2d 171, 174 (3 Cir.1972). However, in order to avoid injustice the courts have developed an exception to this rule which permits a party in an appropriate case to avoid the bar of the statute of limitations where the facts supporting the cause of action were not discoverable in the exercise of due care until it was too late to file suit within time. In those cases,
*31 * * * a cause of action will be held not to accrue until the injured party discovers, or by an exercise of reasonable diligence and intelligence should have discovered that he may have a basis for an actionable claim. [Lopez v. Swyer, 62 N.J. 267, 272 (1973)]
This rule was first enunciated by our Supreme Court in Fernandi v. Strully, 35 N.J. 434 (1961), which confined itself to foreign body medical malpractice actions. Subsequent decisions have gone much further applying the discovery doctrine to medical malpractice actions involving claims other than foreign objects in the body, see Lopez v. Swyer, supra; Fox v. Passaic General Hosp., 71 N.J. 122 (1976); Moran v. Napolitano, 71 N.J. 133 (1976); Duffy v. Ackerhalt, 138 N.J. Super. 119 (App. Div. 1975), certif. den. 70 N.J. 273 (1976); Tramutola v. Bortone, 118 N.J. Super. 503 (App. Div. 1972), mod. 63 N.J. 9 (1973), as well as other actions entirely unrelated to medical malpractice. See Farrell v. Votator Div. of Chemetron Corp., supra; Rosenau v. New Brunswick, supra; New Market Poultry Farms, Inc. v. Fellows, 51 N.J. 419 (1968); Diamond v. N.J. Bell Telephone Co., 51 N.J. 594 (1968). See also Goodman v. Mead Johnson & Co., 534 F.2d 566 (3 Cir.1976), app. pending 45 U.S.L.W. 3182 (1976); Gleason v. United States, supra. If this "discovery rule" applies, a suit is timely if filed within the period of the applicable statute of limitations after the basis of the claim is discovered or should have been discovered in the exercise of reasonable care.
Furthermore, in Fox v. Passaic General Hosp., supra 71 N.J. at 124, our Supreme Court held that a plaintiff who discovers the existence of a malpractice cause of action prior to the expiration of a period of two years after defendant's actionable conduct, has a full two years after such discovery to bring the action unless defendant can establish that the lapse of time between the expiration of two years after the actionable event and the date of institution of the suit peculiarly or unusually prejudiced it, and unless there was reasonable time for plaintiff to institute the action between *32 discovery of the cause of action and expiration of two years after the actionable event.
Initially, it should be noted that plaintiff's damage, his heart attack, coincided with defendants' alleged wrongful act, the exposure of plaintiff to an excessive concentration of Tetrahydrofuran. Thus, both of the elements necessary to maintain a cause of action were in existence at that time  a wrongful act and consequential damage. Cf. Rosenau v. New Brunswick, supra. Furthermore, plaintiff was simultaneously aware of the damage he had sustained. These facts distinguish this case from cases such as New Market Poultry Farms, Inc. v. Fellows, supra, 51 N.J. at 425-426 and Diamond v. N.J. Bell Telephone Co., supra, where plaintiffs were not aware that they had been damaged until long after the statute of limitations had run. In those cases the court also found that plaintiffs' lack of awareness did not result from any lack of due diligence on their part. Therefore, it was held that the causes of action accrued when the damages became reasonably apparent or ascertainable, and that the actions were maintainable since they were filed shortly after those discoveries. Cf. Montag v. Bergen Bluestone Co., 145 N.J. Super. 140 (Law Div. 1976). See also, Torres v. Jersey City Med. Center, 140 N.J. Super. 323 (Law Div. 1976).
Here, on the other hand, plaintiff concedes that he was aware of his damage on September 7, 1971. But he asserts that he was unaware that this damage resulted from defendants' wrongful act until October 7, 1972. This, he argues, entitles him to invoke the discovery rule, relying upon Lopez v. Swyer, supra, and other medical malpractice cases.
In Lopez v. Swyer, plaintiff alleged that she sustained burns, pain, nausea and other injuries as a result of defendant doctor's radiation therapy treatments which followed a radical mastectomy performed by another doctor. These injuries were, of course, obvious to her from the outset. She continued to be treated by defendant doctor's colleagues, codefendants in the case, for a number of years. But she claimed *33 that she was unaware that the injuries were the result of defendant doctor's negligence until she overheard another doctor's casual remark to that effect when she was hospitalized some years later. Treating the discovery rule as one of equity, the court concluded that summary judgment in favor of defendant doctor should be reversed.
Similarly, in Alfone v. Sarno, 139 N.J. Super. 518 (App. Div. 1976), we concluded that plaintiff's malpractice cause of action did not accrue until she became aware that her damages resulted from defendant doctor's negligence, even though she had been aware from the beginning that her damages were the result of his acts. There, we found that the doctor had mislead plaintiff to believe that a surgical instrument had traumatized the parathyroid glands during an operation rendering them dormant. Plaintiff testified that she realized shortly thereafter that she had suffered permanent injury. However, she claimed to be unaware of any negligence until she was subsequently informed by another doctor that a parathyroid gland had, in fact, been removed during the operation. We further noted that plaintiff had placed great trust in defendant, who had been her family physician for a dozen years, and concluded that as a matter of equity plaintiff was entitled to the benefit of the discovery rule.
However, we believe these cases as well as the other medical malpractice cases cited by plaintiff must be distinguished from the case at hand which does not involve the confidence of a doctor-patient relationship which would lead a plaintiff to be less than vigorous in asserting that his physician was negligent and which might well lull plaintiff into sleeping on his rights. Furthermore, there is no suggestion here that defendants concealed their possible liability from plaintiff. Thus, from the moment of his heart attack, plaintiff should have been on inquiry as to the possible causes thereof, and taken appropriate steps to ascertain them.
Extending the discovery rule to cases of this type where the circumstances permit the suggestion that plaintiff may *34 have knowingly slept on his rights would place primary importance on the credibility of the plaintiff. Cf. Fernandi v. Strully, 35 N.J. 434, 450-451 (1961).
It is significant that plaintiff had the can of glue in his possession from five days prior to his heart attack until he turned it over to his present counsel in May 1974. The can contained a warning "Caution: * * * Avoid inhaling fumes * * *," and plaintiff concededly read this legend before he used it in the trench. In fact, plaintiff testified that if it had said "Danger," "toxic," or "adequate ventilation required" he would not have used it in the trench. While he was using the glue in the days just prior to his heart attack he felt dizzy, lightheaded, angry and mean. These symptoms cleared up within an hour or so after leaving his work.
Notwithstanding this testimony, the trial judge permitted plaintiff to invoke the discovery rule on the basis of his statement, which, of course, can neither be corroborated nor contradicted, that he never thought that the glue had anything to do with his heart attack until he was so informed by his attorney in October 1972. Although we do not doubt the credibility of this statement, we nevertheless believe that irrespective of plaintiff's lack of knowledge, the facts of this case mandate the conclusion that on the date of his heart attack plaintiff should have known that he "may have a basis for an actionable claim * * *." Lopez v. Swyer, 62 N.J. at 272. Consequently, we are of the view that under the circumstances of this case the trial judge erred in permitting plaintiff to invoke the discovery rule in contravention of the basic policy of repose embodied in the statute of limitations. Cf. Rankin v. Sowinski, 119 N.J. Super. 393, 401 (App. Div. 1972).
In light of our conclusion that plaintiff's cause of action is barred by the statute of limitations, we do not reach nor do we pass upon the other issues raised on appeal.
*35 The judgment of the Law Division is reversed and the matter is remanded for entry of judgment in favor of the defendants and against the plaintiffs.