181 N.J. Super. 424 (1981)
437 A.2d 925
FRANCIS X. HERMES AND CONSTANCE HERMES, PLAINTIFFS,
v.
LOUIS STAIANO, EMMA STAIANO, HIS WIFE, AND STAIANO WOOD PRODUCTS, INC., DEFENDANTS.
Superior Court of New Jersey, Law Division Hunterdon County.
Decided September 11, 1981.
*426 Thomas R. Chesson for plaintiffs (Porzio, Bromberg & Newman, attorneys).
William A. Shurts for defendants (Felter, Cain & Shurts, attorneys).
LOUIS H. MILLER, J.S.C.
This matter comes before the court on defendants' application to dismiss the complaint at the conclusion of plaintiffs' case. The motion was originally made returnable on the day of trial, but because determination of the motion required a fuller exposition of the facts than was before the court at that time, and because determination of the matter required extension of existing law, the application was continued until the close of plaintiffs' proofs. The matter is now ripe for determination.
At this stage of the trial the following facts have been adduced. Sometime during 1969 defendant Staiano Wood Products, Inc., constructed a single-family residence on a lot owned by defendants Louis and Emma C. Staiano, located at 350 Clover Hill Drive, Califon, Hunterdon County. The home was built pursuant to a written agreement and contract of sale with Donald and Susan Brigham. On November 10, 1969 the lot and dwelling that had been constructed thereon was conveyed to the Brighams by the individual defendants.
On or about January 23, 1973 the present plaintiffs, making their first purchase of a residential property, took title to the subject property from the Brighams. Prior to the closing plaintiffs had apparently inspected the property four or five times after having entered into a contract for the purchase of the property in August 1972. The contract called for no inspections of any of the major systems of the home. Plaintiffs actually moved into the home on or about February 1, 1973.
*427 Shortly after taking possession of the premises plaintiffs noticed minor problems relating to the septic system. For example, the kitchen sink would back up when the dishwasher was running, toilets overflowed when flushed while the washing machine or dishwasher were in operation, and on occasion the toilet itself would not function properly. These events occurred on a relatively infrequent basis and seemed to be alleviated when the use of water was curtailed by various conservation procedures.
Plaintiffs also encountered problems with "flooding" in the basement, which led them to cease using the basement area of the dwelling for purposes of storage of personal goods or belongings. This problem increased to the point where there were at one point several inches of water covering the basement floor, at which time plaintiffs contacted their neighbor, a Mr. Telesco, to find out whether the previous owners had had a similar problem. Telesco visited the property and suggested that if the sump pump were turned on, the water would undoubtedly drain from the basement. This required plugging it in, which was promptly done, and as a result of the procedure the basement did in fact drain.
By May 1976 plaintiffs noticed that substantial portions of the backyard became and remained flooded at most times, and the ground surface of the lawn became soggy, spongy and charged with water. On Father's Day in 1976 the septic system refused to take any discharge from any of the water-using devices of the home, as a result of which temporary measures had to be utilized until the septic tank could be dug up and cleared of accumulated effluent. Plaintiffs testified that thereafter more stringent water-conservation techniques were used by them; this alleviated the problem for short periods of time, after which it would become necessary to have the septic tank pumped out again by a professional tank cleaner.
Also, at about that time, plaintiffs first noticed that a horizontal crack had developed in the rear basement wall of the *428 dwelling. The description of the crack at that time is somewhat vague, but it extended some 10 to 15 feet in length at approximately the middle of the wall and was noticeable.
During March 1978, after a period of severe weather, plaintiffs noticed that some 15 to 18 inches of water had accumulated in the basement and that the sump pump did not appear to be able to handle adequately the total amount of water which was being produced. The water was apparently being introduced into the basement, either through the cinder block walls or through a "French drain" that had been installed around the perimeter of the basement floor at the time of construction. Plaintiffs called the local fire company who pumped out the basement.
Upon inspection of the basement after this procedure plaintiffs determined that the crack in the rear wall of the foundation had increased to some 40 feet in length, with a maximum width of approximately one-sixteenth of an inch at the center. They immediately consulted a professional builder with regard to the crack, as a result of which consultation a complicated system of shoring and bracing was installed in the basement and which remains in place to the present day. This renders a substantial portion of the basement virtually unuseable. Plaintiffs allege that this cracked and buckling foundation threatens the structural integrity of the entire residence.
Plaintiffs' complaint was filed on February 16, 1979, sounding in (a) negligence, (b) breach of implied warranty of habitability, (c) strict liability in tort and (d) fraudulent concealment of material facts.

I
Defendant first contends that the statute of limitations contained in N.J.S.A. 2A:14-1 had run prior to the filing of the complaint, and that the action should have been commenced within six years after the accrual of the plaintiffs' cause of action. No specific date of accrual is urged by defendants, as a *429 result of which it is difficult to determine when such accrual occurred.
To counter this approach, plaintiffs allege that their cause of action did not accrue until well after their purchase of the home in February 1973. They contend that they first had reason to know that there was any serious problem with the septic system prior to March 1976 and that they had no reason to be concerned with the condition of the rear foundation wall until either the events of June 1976 or March 1978 under the circumstances described above.
It has long been established in New Jersey that a cause of action grounded in tort accrues, not when the tortious act occurs but when the consequential injury or the damage occurs. See Diamond v. New Jersey Bell Tel. Co., 51 N.J. 594, 596 (1968); Rosenau v. New Brunswick, 51 N.J. 130, 138 (1968); Gilliam v. Admiral Corp., 111 N.J. Super. 370, 375 (Law Div. 1970); Burd v. New Jersey Tel. Co., 149 N.J. Super. 20, 30 (App.Div. 1977), aff'd 76 N.J. 284 (1978). Plaintiffs urge that in the case at bar their discovery of the defects is well within six years of the bringing of the action. The parties stipulate that the ultimate statute of limitations contained in N.J.S.A. 2A:14-1.1 does not come into play in this matter, because the suit was initiated by plaintiffs within ten years of the delivery of the home to the original purchasers, the Brighams.
In the present state of the case there is no indication that an actionable notice of a defect arose prior to the events which were precipitated by the total stoppage of the septic system on Father's Day in 1976. There was testimony in the form of a transcript of a deposition of Louis Staiano, taken in May 1980, which indicated that sometime in 1970 the septic system had been modified by the introduction of a "shock pit" some 48 feet deep and filled with stone. There was, however, no specific testimony as to the reason why such system was installed. The evidence indicates at the time the septic tank was dug up in June 1976, inferences could be drawn that the tank had never *430 been cleaned prior to that time, and subsequent to that date the system did seem to function satisfactorily for a period of time. Likewise, there is no indication that, before June 1976, there was any problem which had become evident concerning the construction of the dwelling complained of in the present litigation.
Under the circumstances it is evident from the proofs submitted that plaintiffs' cause of action did not accrue until well within six years prior to the filing of the complaint. In the event that defendants are able to establish in the defense of this matter that a cause of action based upon the circumstances of the Brighams' occupancy prior to February 1973 was such that a cause of action against the builder could be deemed to have accrued prior to that date, an appropriate application with regard to the statute of limitations may be forthcoming. At the present time, however, the proofs must be taken with their most favorable inference, which leads to denial of the motion for dismissal on that ground.

II
The second count of the complaint sounds in breach of an implied warranty of habitability. The recent case of McDonald v. Mianecki, 79 N.J. 275 (1979), held that the doctrine of implied warranty of habitability applies to the construction of new homes by builder-vendors. The Supreme Court expressly left open the issue of whether subsequent purchasers were within the protection of the implied warranty of habitability in that case. 79 N.J. at 295, n. 5.
Courts in other jurisdictions seem to be split on that issue. Generally, older cases suggest that the implied warranty of habitability does not apply to a used home. The cases cited by defendants in support of an interpretation which would limit the liability under an implied warranty of habitability to first purchasers of residences include Duncan v. Schuster-Graham Homes, Inc., 194 Colo. 441, 578 P.2d 637 (1978); Herz v. Thornwood *431 Acres "D" Inc., 86 Misc.2d 53, 381 N.Y.S.2d 761 (Justice Ct. 1976), aff'd 91 Misc.2d 130, 397 N.Y.S.2d 358 (1977); Brown v. Fowler, S.D., 279 N.W.2d 907 (Sup.Ct. 1979); Mazurek v. Nielsen, 42 Colo. App. 386, 599 P.2d 269 (Ct.App. 1979); Coburn v. Lenox Homes, Inc., 173 Conn. 567, 378 A.2d 599 (Sup.Ct.Err. 1977); Oliver v. City Builders, Inc., 303 So.2d 466 (Miss.Sup.Ct. 1974); Wright v. Creative Corp., 30 Colo. App. 575, 498 P.2d 1179 (Ct.App. 1972).
Many jurisdictions have, on the other hand, extended the implied warranty of habitability to subsequent purchasers. In Barnes v. MacBrown & Co., 264 Ind. 227, 342 N.E.2d 619 (1976), the Indiana Supreme Court held that the implied warranty of fitness for habitation extends to such subsequent purchasers in the case of latent defects which become manifest after the purchase and which are not discoverable by the subsequent purchaser's reasonable inspection. That court analyzed the doctrine by noting that the implied warranty of habitability was to real property what the implied warranty of merchantability was to personal property. The court reasoned that:
The logic which compelled this change in the law of personal property is equally persuasive in the area of real property. Our society is an increasingly mobile one. Our technology is increasingly complex. The traditional requirement of privity between a builder-vendor and a purchaser is an outmoded one. .. As with our treatment of the sale of personal property, the manufacturer of a home must be accorded reasonable freedom and protection. This extension of liability is limited to latent defects, not discoverable by a subsequent purchaser's reasonable inspection, manifesting themselves after the purchase. The standard to be applied in determining whether or not there has been a breach of warranty is one of reasonableness in light of the surrounding circumstances. [342 N.E. at 628.]
A similar conclusion was reached in Moxley v. Laramie Builders, Inc., 600 P.2d 733 (Wyo.Sup.Ct. 1979). That case held that:
Consumer protection demands that those who buy homes are entitled to rely on the skill of a builder and that the house is constructed so as to be reasonably fit for its intended use. The average purchaser is without adequate knowledge of the component parts of a residential structure. [at 733]
See, also, Wagner Constr. Co. v. Noonan, Ind. App., 403 N.E.2d 1144 (Ct.App. 1980).
*432 This court is inclined to find that a warranty of habitability extends to plaintiffs as subsequent purchasers of this residence, as a logical extension of McDonald v. Mianecki, supra. A residential structure contains numerous concealed systems that are not subject to ready inspection by any purchaser, and which were installed under the control of a builder-vendor and often remain within the walls, floors or surrounding grounds for a period of several years before a defect can be observed. Obviously, the builder-vendor is in a better position to prevent the occurrence of such major problems and must know that the systems will remain hidden and that both the initial purchaser and anyone else who purchases the home will rely upon the skill and experience of the builder-vendor for their proper functioning.
In the case at bar defects alleged are in an underground sewage disposal system, which consists of an outflow pipe leading from the house to a septic tank, which "digests" the effluent by bacterial action and then transmits the residue by flow of water through a distribution box to a septic bed, from which point the water percolates downward into the ground while bacterial action further dissolves any remaining effluent. The other feature of the house which is alleged to be defective is a foundation wall.
Obviously, both of such components of the home are designed as permanent features and are not subject to ready inspection as to internal defects. The effect of a defect in either or both of these systems is, from the facts present before the court, being felt by plaintiffs Hermes, who are subsequent purchasers. They should be protected by the implied warranty of habitability if there are no intervening factors to otherwise insulate the builder from liability.

III
Defendants finally argue that the third count of the complaint asserting a breach of defendants' duty owed to plaintiffs *433 based upon strict liability in tort, should be dismissed. This question was also specifically left unanswered by McDonald v. Mianecki, supra at 295. In support of a position that strict liability should not be available to remote purchasers of a home, defendant cites Oliver v. City Builders, Inc., supra, which held to that effect.
Privity of contract, however, has never been an element of products liability. In Huddell v. Levin, 537 F.2d 726 (1976), the Third Circuit, applying New Jersey law, held that New Jersey's strict liability theory imposes, in effect, a warranty obligation upon the manufacturer, but is intended to remove the contractual impediments such as privity of contract, which were once associated with warranty actions.
Jakubowski v. Minnesota Mining and Mfg. Co., 80 N.J. Super. 184 (App.Div. 1963), rev'd on other grounds, 42 N.J. 177 (1964), held that privity of contract was not an element in a products liability action against the manufacturer of a defective product. See, also, Okker v. Chrome Furniture Mfg. Corp., 26 N.J. Super. 295 (App.Div. 1953). The rationale of those cases should be extended to subsequent, innocent purchasers of residential properties, whether they be initial or subsequent purchasers. There is no logical reason to differentiate between the two categories of consumer.
As a result thereof, defendants' application for dismissal is denied and the matter may proceed to a hearing on defense of all issues.